**Emanuel FRIEDRICH,
Plaintiff–Appellee,**

v.

**Jeana Michele FRIEDRICH,
Defendant–Appellant,**

**David Harper and Shirley
Harper, Defendants.**

No. 94–3832.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 1, 1996.

Decided March 13, 1996.

Gary J. Gottfried (argued and briefed), Columbus, OH, for plaintiff-appellee.

Anthony Joseph Iaciofano (briefed), Lisa M. Bitter (argued), Benjamin, Yocum & Heather, Cincinnati, OH, for defendant-appellant.

Before: KEITH, BOGGS, and SILER, Circuit Judges.

BOGGS, Circuit Judge.

For the second time, we address the application of the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention") and its implementing legislation, the International Child Abduction Remedies Act ("the Act"), 42 U.S.C. §§ 11601–11610, to the life of Thomas Friedrich, now age six. We affirm the district court's order that Thomas was wrongfully removed from Germany and should be returned.

## I

Thomas was born in Bad Aibling, Germany, to Jeana Friedrich, an American servicewoman stationed there, and her husband, Emanuel Friedrich, a German citizen. When Thomas was two years old, his parents separated after an argument on July 27, 1991. Less than a week later, in the early morning of August 2, 1991, Mrs. Friedrich took Thomas from Germany to her family home in Ironton, Ohio, without informing Mr. Friedrich. Mr. Friedrich sought return of the child in German Family Court, obtaining an order awarding him custody on August 22. He then filed this action for the return of his son in the United States District Court for the Southern District of Ohio on September 23.

We first heard this case three years ago. *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir.1993) ("*Friedrich I*"). At that time, we reversed the district court's denial of Mr. Friedrich's claim for the return of his son to Germany pursuant to the Convention. We outlined the relevant law on what was then an issue of first impression in the federal appellate courts, and remanded with instructions that the district court determine whether, as a matter of German law, Mr. Friedrich was exercising custody rights to Thomas at the time of removal. We also asked the district court to decide if Mrs. Friedrich could prove any of the four affirmative defenses provided by the Convention and the Act. Thomas, meanwhile, remained with his mother and his mother's parents in Ohio.

■ On remand, the district court allowed additional discovery and held a new hearing. The court eventually determined that, at the time of Thomas's removal on August 1, 1991, Mr. Friedrich was exercising custody rights to Thomas under German law, or would have been exercising such rights but for the removal. The court then held that Mrs. Friedrich had not established any of the affirmative defenses available to her under the Convention. The court ordered Mrs. Friedrich to return Thomas to Germany "forthwith," but later stayed the order, upon the posting of a bond by Mrs. Friedrich, pending the resolution of this appeal.[1]

Mrs. Friedrich's appeal raises two issues that are central to the young jurisprudence of the Hague Convention. First, what does it mean to "exercise" custody rights? Second, when can a court refuse to return a child who has been wrongfully removed from a country because return of the abducted child would result in a "grave" risk of harm?

■ In answering both these questions, we keep in mind two general principles inherent in the Convention and the Act, expressed in *Friedrich I,* and subsequently embraced by unanimous federal authority. First, a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute. Hague Convention, Article 19; 42 U.S.C. § 11601(b)(4); *Friedrich*

---

1. The stay of the judge's order pending appeal, hotly contested below, is not now challenged by Mr. Friedrich. It may have been improvident. Staying the return of a child in an action under the Convention should hardly be a matter of course. The aim of the Convention is to secure prompt return of the child to the correct jurisdiction, and any unnecessary delay renders the subsequent return more difficult for the child, and subsequent adjudication more difficult for the foreign court.

*I,* 983 F.2d at 1400; *Rydder v. Rydder,* 49 F.3d 369, 372 (8th Cir.1995); *Feder v. Evans–Feder,* 63 F.3d 217, 221 (3d Cir.1995); *Journe v. Journe,* 911 F.Supp. 43 (D.P.R. 1995). Second, the Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court. Pub. Notice 957, 51 Fed.Reg. 10494, 10505 (1986); *Friedrich I,* 983 F.2d at 1400; *Rydder,* 49 F.3d at 372; *Feder,* 63 F.3d at 221; *Wanninger v. Wanninger,* 850 F.Supp. 78, 80 (D.Mass.1994).

## II

■■■ The removal of a child from the country of its habitual residence is "wrongful" under the Hague Convention if a person in that country is, or would otherwise be, exercising custody rights to the child under that country's law at the moment of removal. Hague Convention, Article 3. The plaintiff in an action for return of the child has the burden of proving the exercise of custody rights by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A). We review the district court's findings of fact for clear error and review its conclusions about American, foreign, and international law *de novo. See* Fed.R.Civ.P. 44.1 (a district court's determination of foreign law should be reviewed as a ruling on a question of law); *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala Navala,* 29 F.3d 79, 81 (2d Cir.1994) (reviewing question of foreign law *de novo* ); *Echeverria–Hernandez v. I.N.S.,* 923 F.2d 688, 692 (9th Cir.1991) (reviewing question of international law *de novo* ).

■■■ The district court held that a preponderance of the evidence in the record established that Mr. Friedrich was exercising custody rights over Thomas at the time of Thomas's removal. Mrs. Friedrich alleges that the district court improperly applied German law. Reviewing *de novo,* we find no error in the court's legal analysis. Custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." Hague Convention, Article 3. German law gives both parents equal *de jure* custody of the child, German Civil Code 1626(1), and, with a few exceptions, this *de jure* custody continues until a competent court says otherwise. *See Currier v. Currier,* 845 F.Supp. 916, 920 (D.N.H.1994) ("under German law both parents retain joint rights of custody until a decree has been entered limiting one parent's rights"); *Wanninger,* 850 F.Supp. at 78 (D.Mass.1994).

Mrs. Friedrich argues that Mr. Friedrich "terminated" his custody rights under German law because, during the argument on the evening of July 27, 1991, he placed Thomas's belongings and hers in the hallway outside of their apartment. The district court properly rejected the claim that these actions could end parental rights as a matter of German law. We agree. After examining the record, we are uncertain as to exactly what happened on the evening of July 27, but we do know that the events of that night were not a judicial abrogation of custody rights. Nor are we persuaded by Mrs. Friedrich's attempts to read the German Civil Code provisions stipulated to by the parties in such a way as to create the ability of one parent to terminate his or her custody rights extrajudicially.[2]

Mrs. Friedrich also argues that, even if Mr. Friedrich had custody rights under German law, he was not *exercising* those custody rights as contemplated by the Hague Convention. She argues that, since custody rights include the care for the person and property of the child, Mr. Friedrich was not exercising custody rights because he was not

---

**2.** Mrs. Friedrich cites German Civil Code § 1629, which says that a parent who exercises parental care alone can also represent the child in legal matters alone. Obviously, the ability of one parent to "represent" the child does not imply that the other parent has no custody rights. Mrs. Friedrich also cites German Civil Code § 1631, which says that the Family Court, if petitioned, can assist the parents in providing parental care. We have no idea how this provision, which is essentially no more than a grant of jurisdiction to appoint and direct a family services officer, can support Mrs. Friedrich's claim that "a German parent can certainly relinquish custody or parental rights absent a judicial determination." Defendants–Appellants' Brief at 15.

paying for or taking care of the child during the brief period of separation in Germany.

The Hague Convention does not define "exercise." As judges in a common law country, we can easily imagine doing so ourselves. One might look to the law of the foreign country to determine if custody rights existed *de jure,* and then develop a test under the general principles of the Hague Convention to determine what activities—financial support, visitation—constitute sufficient exercise of *de jure* rights. The question in our immediate case would then be: "was Mr. Friedrich's single visit with Thomas and plans for future visits with Thomas sufficient exercise of custodial rights for us to justify calling the removal of Thomas wrongful?" One might even approach a distinction between the exercise of "custody" rights and the exercise of "access" or "visitation" rights.[3] If Mr. Friedrich, who has *de jure* custody, was not exercising sufficient *de facto* custody, Thomas's removal would not be wrongful.

We think it unwise to attempt any such project. Enforcement of the Convention should not to be made dependent on the creation of a common law definition of "exercise." The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find "exercise" whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.

We see three reasons for this broad definition of "exercise." First, American courts are not well suited to determine the consequences of parental behavior under the law of a foreign country. It is fairly easy for the courts of one country to determine whether a person has custody rights under the law of another country. It is also quite possible for a court to determine if an order by a foreign court awards someone "custody" rights, as opposed to rights of "access."[4] Far more difficult is the task of deciding, prior to a ruling by a court in the abducted-from country, if a parent's custody rights should be ignored because he or she was not acting sufficiently like a custodial parent. A foreign court, if at all possible, should refrain from making such policy-oriented decisions concerning the application of German law to a child whose habitual residence is, or was, Germany.

Second, an American decision about the adequacy of one parent's exercise of custody rights is dangerously close to forbidden territory: the merits of the custody dispute. The German court in this case is perfectly capable of taking into account Mr. Friedrich's behavior during the August 1991 separation, and the German court presumably will tailor its custody order accordingly. A decision by an American court to deny return to Germany because Mr. Friedrich did not show sufficient attention or concern for Thomas's welfare would preclude the German court from addressing these issues—and the German court may well resolve them differently.

Third, the confusing dynamics of quarrels and informal separations make it difficult to assess adequately the acts and motivations of a parent. An occasional visit may be all that is available to someone left, by the vagaries of marital discord, temporarily without the child. Often the child may be avoided, not out of a desire to relinquish custody, but out of anger, pride, embarrassment, or fear, vis à vis the other parent.[5] Reading too much into

3. Article 21 of the Hague Convention instructs signatory countries to protect the "rights of access" of non-custodial parents to their children. Courts have yet to address the question whether Article 21 implies that a custodial parent can remove a child from its country of habitual residence without the permission of a parent whose rights that country's courts have expressly limited to "visitation." *See infra* n. 4.

4. For a particularly difficult situation, ably resolved, see *David S. v. Zamira,* 151 Misc.2d 630, 574 N.Y.S.2d 429 (Fam.Ct.1991), *aff'd In re Schneir,* 17 F.L.R. 1237 (N.Y.App.Div.2d Dep't).

The court here held that an order giving the non-custodial parent visitation rights and restricting the custodial parent from leaving the country constitutes an order granting "custodial" rights to both parents under the Hague Convention.

5. When Mrs. Friedrich took Thomas and her belongings from the family apartment on the morning of July 28, she was accompanied by some friends from work: soldiers of the United States Army. Mr. Friedrich testified that he was "intimidated" by the presence of the soldiers, and discouraged from making a stronger objection to the removal of his child.

a parent's behavior during these difficult times could be inaccurate and unfair. Although there may be situations when a long period of unexplainable neglect of the child could constitute non-exercise of otherwise valid custody rights under the Convention, as a general rule, any attempt to maintain a somewhat regular relationship with the child should constitute "exercise." This rule leaves the full resolution of custody issues, as the Convention and common sense indicate, to the courts of the country of habitual residence.

We are well aware that our approach requires a parent, in the event of a separation or custody dispute, to seek permission from the other parent or from the courts before taking a child out of the country of its habitual residence. Any other approach allows a parent to pick a "home court" for the custody dispute *ex parte*, defeating a primary purpose of the Convention. We believe that, where the reason for removal is legitimate, it will not usually be difficult to obtain approval from either the other parent or a foreign court. Furthermore, as the case for removal of the child in the custody of one parent becomes more compelling, approval (at least the approval of a foreign court) should become easier to secure.

Mrs. Friedrich argues that our approach cannot adequately cope with emergency situations that require the child and parent to leave the country. In her case, for example, Mrs. Friedrich claims that removal of Thomas to Ohio was necessary because she could no longer afford to have the child stay at the army base, and Mr. Friedrich refused to provide shelter. Examining the record, we seriously doubt that Mr. Friedrich would have refused to lodge Thomas at his expense in Germany. In any event, even if an emergency forces a parent to take a child to a foreign country, any such emergency cannot excuse the parent from returning the child to the jurisdiction once return of the child becomes safe. Nor can an emergency justify a parent's refusal to submit the child to the

authority of the foreign court for resolution of custody matters, including the question of the appropriate temporary residence of the child. *See Viragh v. Foldes,* 415 Mass. 96, 612 N.E.2d 241 (1993) (child removed to America by one parent without notification to other parent may remain in America in light of decision by Hungarian court in parallel proceeding that best interests of the child require exercise of sole custody by parent in America).

 We therefore hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.[6] Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts. 42 U.S.C. § 11601(b)(4).

In this case, German law gave Mr. Friedrich custody rights to Thomas. The facts before us clearly indicate that he attempted to exercise these rights during the separation from his wife. Mr. and Mrs. Friedrich argued during the evening of July 27, 1991, and separated on the morning of July 28. Mrs. Friedrich left with her belongings and Thomas. She stayed on the army base with the child for four days. Mr. Friedrich telephoned Mrs. Friedrich on July 29 to arrange a visit with Thomas, and spent the afternoon of that day with his son. Mr. and Mrs. Friedrich met on August 1 to talk about Thomas and their separation. The parties dispute the upshot of this conversation. Mrs. Friedrich says that Mr. Friedrich expressed a general willingness that Thomas move to America with his mother. Mr. Friedrich denies this. It is clear, however,

---

**6.** The situation would be different if the country of habitual residence had a legal rule regarding the exercise of custody rights clearly tied to the Hague concept of international removal. If, for example, Germany had a law stating that, for the purposes of the Convention, mere visitation without financial support during a period of informal separation does not constitute the "exercise" of custody rights, we would, of course, be bound to apply that law in this case.

that the parties did agree to immediate visitations of Thomas by Mr. Friedrich, scheduling the first such visit for August 3. Shortly after midnight on August 2, Mrs. Friedrich took her son and, without informing her husband,[7] left for America by airplane.

■ Because Mr. Friedrich had custody rights to Thomas as a matter of German law, and did not clearly abandon those rights prior to August 1, the removal of Thomas without his consent was wrongful under the Convention, regardless of any other considerations about Mr. Friedrich's behavior during the family's separation in Germany.

### III

■ Once a plaintiff establishes that removal was wrongful, the child must be returned unless the defendant can establish one of four defenses. Two of these defenses can be established by a preponderance of the evidence, 42 U.S.C. § 11603(e)(2)(B): the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment, Hague Convention, Article 12; or, the person seeking return of the child consented to or subsequently acquiesced in the removal or retention, Hague Convention, Article 13a. The other two defenses must be shown by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A): there is a grave risk that the return of the child would expose it to physical or psychological harm, Hague Convention, Article 13b; or, the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," Hague Convention, Article 20.[8]

■ All four of these exceptions are "narrow," 42 U.S.C. § 11601(a)(4). They are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute. *See Rydder,* 49 F.3d at 372 (citing *Friedrich I,* 983 F.2d at 1400). In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention. *Feder,* 63 F.3d at 226 (citing Pub. Notice 957, 51 Fed. Reg. 10494, 10509 (1986)).

Mrs. Friedrich alleges that she proved by clear and convincing evidence in the proceedings below that the return of Thomas to Germany would cause him grave psychological harm. Mrs. Friedrich testified that Thomas has grown attached to family and friends in Ohio. She also hired an expert psychologist who testified that returning Thomas to Germany would be traumatic and difficult for the child, who was currently happy and healthy in America with his mother.

[Thomas] definitely would experience the loss of his mother ... if he were to be removed to Germany. That would be a considerable loss.

And there then would be the probabilities of anger both towards his mother, who it might appear that she has abandoned him [sic], and towards the father for creating that abandonment. [These feelings] could be plenty enough springboard for other developmental or emotional restrictions which could include nightmares, antisocial behavior, a whole host of anxious-type behavior.

Blaske Deposition at 28–29.

■ If we are to take the international obligations of American courts with any degree of seriousness, the exception to the Hague Convention for grave harm to the child requires far more than the evidence that Mrs. Friedrich provides. Mrs. Friedrich alleges nothing more than *adjustment* problems that would attend the relocation of most children. There is no allegation that Mr. Friedrich has ever abused Thomas. The

---

7. Q. You didn't call your husband, Mrs. Friedrich, because you didn't want him to know you were leaving; isn't that the reason?
A. Yes it is.
Transcript of October 16, 1991, Proceedings at 36.

8. The situation changes somewhat when the child is older. The Hague Convention allows a

court in the abducted-to country to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Article 13.

district court found that the home that Mr. Friedrich has prepared for Thomas in Germany appears adequate to the needs of any young child. The father does not work long hours, and the child's German grandmother is ready to care for the child when the father cannot. There is nothing in the record to indicate that life in Germany would result in any permanent harm or unhappiness.

■ Furthermore, even *if* the home of Mr. Friedrich were a grim place to raise a child in comparison to the pretty, peaceful streets of Ironton, Ohio, that fact would be irrelevant to a federal court's obligation under the Convention. We are not to debate the relevant virtues of Batman and *Max und Moritz,* Wheaties and *Milchreis.* The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence.

Mrs. Friedrich advocates a wide interpretation of the grave risk of harm exception that would reward her for violating the Convention. A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted.[9] Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return. The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a "grave" risk of harm for the purposes of the Convention.

In thinking about these problems, we acknowledge that courts in the abducted-from country are as ready and able as we are to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly. *Cf. Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 377 (8th Cir.1995) (if parent in Mexico is abusive, infant returned to Mexico for custody determination can be institutionalized during pendency of custody proceedings). And if

Germany really is a poor place for young Thomas to grow up, as Mrs. Friedrich contends, we can expect the German courts to recognize that and award her custody in America. When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate.

The international precedent available supports our restrictive reading of the grave harm exception. In *Thomson v. Thomson,* 119 D.L.R.4th 253 (Can.1994), the Supreme Court of Canada held that the exception applies only to harm "that also amounts to an intolerable situation." *Id.* at 286. The Court of Appeal of the United Kingdom has held that the harm required is "something greater than would normally be expected on taking a child away from one parent and passing him to another." *In re A.,* 1 F.L.R. 365, 372 (Eng.C.A.1988). And other circuit courts in America have followed this reasoning in cases decided since *Friedrich I. See Nunez–Escudero,* 58 F.3d at 377 (citing *Thomson,* 119 D.L.R.4th at 286, and *In re A.,* 1 F.L.R. at 372); *Rydder,* 49 F.3d at 373 (affirming district court order for return of child over abducting parent's objection that return would cause grave harm). Finally, we are instructed by the following observation by the United States Department of State concerning the grave risk of harm exception.

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an *intolerable* situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities

---

9. We forgo the temptation to compare this behavior to the standard definition of "chutzpah."

*See* A. Kozinski & E. Volokh, *Lawsuit, Shmawsuit,* 103 Yale L.J. 463, 467 (1993).

are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

Public Notice 957, 51 FR 10494, 10510 (March 26, 1986) (emphasis added).

■ For all of these reasons, we hold that the district court did not err by holding that "[t]he record in the instant case does not demonstrate by clear and convincing evidence that Thomas will be exposed to a grave risk of harm." Although it is not necessary to resolve the present appeal, we believe that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.*, returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection. Psychological evidence of the sort Mrs. Friedrich introduced in the proceeding below is only relevant if it helps prove the existence of one of these two situations.[10]

## IV

Mrs. Friedrich also claims that the district court erred in ordering Thomas's return because Mrs. Friedrich proved by a preponderance of the evidence that Mr. Friedrich (i) consented to, and (ii) subsequently acquiesced in, the removal of Thomas to America.[11]

■ Mrs. Friedrich bases her claim of consent to removal on statements that she claims Mr. Friedrich made to her during their separation. Mr. Friedrich flatly denies that he made these statements. The district court was faced with a choice as to whom it found more believable in a factual dispute. There is nothing in the record to suggest that the court's decision to believe Mr. Friedrich, and hold that he "did not exhibit an intention or a willingness to terminate his parental rights," was clearly erroneous. In fact, Mr. Friedrich's testimony is strongly supported by the circumstances of the removal of Thomas—most notably the fact that Mrs. Friedrich did not inform Mr. Friedrich that she was departing. *Supra* n. 7. The deliberately secretive nature of her actions is extremely strong evidence that Mr. Friedrich would not have consented to the removal of Thomas. For these reasons, we hold that the district court did not abuse its discretion in finding that Mrs. Friedrich took Thomas to America without Mr. Friedrich's consent.

Mrs. Friedrich bases her claim of subsequent acquiescence on a statement made by Mr. Friedrich to one of her commanding officers, Captain Michael Farley, at a cocktail party on the military base after Mrs. Friedrich had left with Thomas. Captain Farley, who cannot date the conversation exactly, testified that:

> During the conversation, Mr. Friedrich indicated that he was not seeking custody of the child, because he didn't have the means to take care of the child.

Farley Deposition at 13. Mr. Friedrich denies that he made this statement. The district court made no specific finding regarding this fact.

---

10. The only other circuit addressing the issue had its own doubts about whether a psychological report concerning the difficulty that a child would face when separated from the abducting parent is ever relevant to a Hague Convention action. *Nunez–Escudero*, 58 F.3d at 378 (such reports are not per se irrelevant, but they are rarely dispositive).

11. Article 13a provides a defense to an action for return if the petitioner "consented to or subsequently acquiesced in the removal or retention" of the child. The Convention does not define consent or acquiescence in any more definite manner, and there is no statement to guide us in the text or legislative history of the Act.

We believe that the statement to Captain Farley, even if it was made, is insufficient evidence of subsequent acquiescence. Subsequent acquiescence requires more than an isolated statement to a third-party. Each *of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights.* See Wanninger, 850 F.Supp. at 81–82 (refusing to construe father's personal letters to wife and priest as sufficient evidence of acquiescence where father consistently attempted to keep in contact with child). *Although we must decide the matter without guidance from previous appellate court decisions, we believe that acquiescence under the Convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding;* [12] *a convincing written renunciation of rights;* [13] *or a consistent attitude of acquiescence over a significant period of time.*

By August 22, 1991, twenty-one days after the abduction, Mr. Friedrich had secured a German court order awarding him custody of Thomas. He has resolutely sought custody of his son since that time. It is by these acts, not his casual statements to third parties, that we will determine whether or not he acquiesced to the retention of his son in America. Since Mrs. Friedrich has not introduced evidence of a formal renunciation or a consistent attitude of acquiescence over a significant period of time, the judgment of the district court on this matter was not erroneous.

## V

The district court's order that Thomas be immediately returned to Germany is **AFFIRMED,** and the district court's stay of that order pending appeal is **VACATED.** Because Thomas's return to Germany is already long-overdue, we order, pursuant to Fed.R.App.P. 41(a), that our mandate issue forthwith.

---

12. In *Journe v. Journe,* 911 F.Supp. 43 (D.P.R. 1995), a French father instituted custody proceedings in France after the mother took the children to Puerto Rico. The mother returned to France, presumably without the children, to participate in the proceedings. The father voluntarily dismissed the French custody proceedings, but continued to pursue Hague Convention remedies The district court held that the father had waived his rights to have a French court determine custody issues by virtue of the voluntary dismissal of his French case. *Id.* at 48. The court reached that decision because of "its equitable powers," not because the dismissal constituted "acquiescence" for the purposes of the Convention.

13. A hastily-drafted and soon-rued written agreement was found insufficient indication of consent in *Currier v. Currier,* 845 F.Supp. 916 (D.N.H. 1994).